174 N.J. Super. 73 (1980)
415 A.2d 381
JERRY N. FRIEDLAND AND FRIEDLAND AND RUDOLPH, PLAINTIFFS,
v.
MORDECAI PODHORETZ, DEFENDANT.
Superior Court of New Jersey, Law Division  Passaic County.
Decided April 23, 1980.
*74 Friedland and Rudolph for plaintiff (Dennis W. Blake appearing).
Tarella & Liftman for defendant (James A. Tarella appearing).
*75 HUMPHREYS, J.S.C.
Plaintiff attorneys sue for fees, and also for libel and malicious prosecution, arising from defendant's filing a complaint with the Ethics Committee. The malicious prosecution action is brought pursuant to N.J.S.A. 2A:47A-1 which specifically authorizes such an action. Defendant moves for summary judgment as to the libel and malicious prosecution claims. The primary issue is whether the statute is unconstitutional as an encroachment upon the jurisdiction of the Supreme Court over the discipline of attorneys. N.J.Const. (1947), Art. VI, § II, par. 3.
In Toft v. Ketchum, our Supreme Court held that the filing of an ethics complaint "is privileged and that an attorney cannot predicate a malicious prosecution action or similar suit upon it." 18 N.J. 280, 287 (1955), cert. den. 350 U.S. 887, 76 S.Ct. 141, 100 L.Ed. 782 (1955). The statute in question was passed shortly after the Toft decision. In effect, the statute reversed the holding in Toft. Whether the statute is constitutional was posed but not reached in Black v. Keoner, 44 N.J. 140, 141 (1965).
One who attacks the constitutionality of a statute bears a formidable burden. There is a strong presumption that a statute is constitutional. Indeed, a statute will not be declared void unless its repugnance to the Constitution is clear beyond a reasonable doubt. Harvey v. Essex Freeholders, 30 N.J. 381, 388 (1959). These strictures may be even more binding upon a trial court than an appellate court. Blair v. Erie Lackawanna R. Co., 124 N.J. Super. 162, 168 (Law Div. 1973); Noyes v. Cohen's Estate, 123 N.J. Super. 471, 480 (Ch.Div. 1973); Three L. Corp. v. Newark Bd. of Adj., 118 N.J. Super. 453, 455 (Law Div. 1972).
The reasons for judicial reluctance to declare a statute unconstitutional were comprehensively set forth in N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1 (1972) as follows:
One of the most delicate tasks a court has to perform is to adjudicate the constitutionality of a statute. In our tripartite form of government that high *76 prerogative has always been exercised with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives. As a result, judicial decisions from the time of Chief Justice Marshall reveal an unswerving acceptance of the principle that every possible presumption favors the validity of an act of the Legislature. As we noted, all the relevant New Jersey cases display faithful judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised by the Legislature to serve a public purpose conform to the Constitution. And these cases project into the forefront of any judicial study of an attack upon a duly enacted statute both the strong presumption of validity and our solemn duty to resolve reasonably conflicting doubts in favor of conformity to our organic charter....
The judicial branch of the government does not and cannot concern itself with the wisdom or policy of a statute. Such matters are the exclusive concern of the legislative branch, and the doctrine is firmly settled that its enactment may not be stricken because a court thinks it unwise. (citations omitted). In emphasizing the common sense of these controlling general principles, in his dissent in McCutcheon v. State Building Authority, 13 N.J. 46, 79 (1953), Justice Jacobs quoted the striking language of Justice Holmes in Missouri, Kan. & Tex. Ry. Co. of Tex. v. May, 194 U.S. 267, 270, 271, 24 S.Ct. 638, 48 L.Ed. 971, 973 (1904):
"Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." [At 8]
In the present case the assault on the statute has a narrow thrust. The statute does not impair in any way the constitutional rights of citizens, rights which the courts must cherish and protect. The Legislature in this case is not defying or failing to comply with a constitutional mandate. See Robinson v. Cahill, 62 N.J. 473 (1973), and its progeny. Moreover, the Legislature is not acting outside its sphere of authority. In this case the Legislature restored a common law right to sue. As Judge Goldmann said in Magierowski v. Buckley, 39 N.J. Super. 534, 558 (App.Div. 1956), "A state has the constitutional and legislative power to change or modify the common law; the Constitution does not forbid the creation of new rights or the abolition of *77 old ones recognized by the common law, if the purpose is to [obtain] a permissible legislative object." (Emphasis supplied). The fact that the judiciary had abolished in Toft the right to sue does not affect the Legislature's right to restore it. An analogous situation is when the Supreme Court abolished the charitable immunity doctrine. Benton v. YMCA of Westfield, 27 N.J. 67 (1958). The Legislature restored the immunity in part, N.J.S.A. 2A:53A-7, and the judiciary deferred to the legislative judgment. La Parre v. YMCA of Oranges, 30 N.J. 225 (1959). "In short, judge-made law ... is at all times subject to legislative supervision and change. The Legislature clearly has the last word." Busik v. Levine, 63 N.J. 351, 394 (1973) (dissenting opinion, Mountain, J.). See also 15A Am.Jur.2d, Common Law, § 18 at 617, 618.
Furthermore, the statute does not directly enter the judicial realm. The statute does not purport to discipline lawyers or regulate their admission, practice or expulsion. It merely gives all professional persons, lawyers and nonlawyers alike, a cause of action against any person who "falsely and maliciously and without probable cause" makes a complaint to any public body having the right to discipline that professional. N.J.S.A. 2A:47A-1.
Thus the precise and narrow issue here is whether the Legislature, in restoring to attorneys a cause of action enjoyed by all other professionals, has unconstitutionally encroached upon the Supreme Court's "jurisdiction over ... the discipline of [lawyers]." N.J. Const. (1947), Art. VI, § II, par. 3. Defendant contends that it has encroached on that authority, relying on language in Chief Justice Vanderbilt's opinion in Toft v. Ketchum, supra, and also on the case of Ramstead v. Morgan, 219 Or. 383, 347 P.2d 594 (Sup.Ct. 1959).
In Toft the Chief Justice concluded that a cause of action for malicious prosecution could be brought for the institution of a nonjudicial action, "at least where such proceedings are adjudicatory *78 in nature and may adversely affect legally protected interests." 18 N.J. at 284. In deciding whether lawyers should be barred from bringing such an action, he noted that "We are confronted with two conflicting considerations of policy." After discussing the merits and demerits of these two policies, the Chief Justice, speaking for the majority of the court, chose the policy barring attorneys from bringing the suit. He said that "in attempting to do justice between these two conflicting interests, we are necessarily forced to give great weight to the fact that we have been charged by the Constitution with the solemn duty of ridding the bar of those who are unfit to practice our profession." In other words, the Chief Justice, in choosing between two conflicting policies, gave "great weight" to the possible adverse effects such lawsuits might have upon the Supreme Court's authority and duty to discipline attorneys. This is a far cry from a conclusion that the Chief Justice was declaring this area to be off-limits to the Legislature. The majority of the court in Toft was engaging in the court's prerogative of changing the common law to meet what the court considered to be the needs of the time. The issue in Toft was not a constitutional one. The issue was what was the best public policy, i.e., should a person who is an attorney be able to obtain redress in the courts against one who has acted against him maliciously and without probable cause. Policy determinations are fundamentally for the Legislature, not for the courts. As Chief Justice Weintraub said in Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199 (1960):
It is worth repeating that the judiciary is not concerned with the good sense of a statute. Policy matters are the exclusive responsibility of the legislative branch of government. A judge as a private citizen, may express his opinion at the polls.... But the issue now before us is wholly one of the power of the legislature to act, and upon that inquiry a judge would usurp authority if his personal view of policy intruded upon his deliberations. [At 229; emphasis supplied]
See, also, Thomas v. Kingsley, 43 N.J. 524, 530 (1965).
*79 Judge Conford observed in Vornado v. Hyland, 77 N.J. 347 (1978), that
Courts have a paramount obligation not to invalidate legislation merely because they disapprove its public policy. To yield to the impulse to do so is to subvert the sensitive interrelationship between the three branches of government which is at the heart of our form of democracy. [At 355]
In dealing with the constitutionality of a statute, a court should never forget that it is passing on the judgment of the elected representatives of the people. Legislators are elected to carry out or at least reflect the will of the people. Judges in this State are appointed, not elected. We are not appointed to carry out our views of the will of the people, except as that will is found in the Constitution, legislation and common law of our State. Thus, our views of public policy must yield to the legislative reflection of the public will.
These principles are even more constricting when the policy questions are reasonably debatable. This is the case here, as shown by Justice Jacobs' persuasive concurring opinion in Toft, supra, joined in by two other justices, in which he vigorously attacks the premises and conclusions of the majority opinion. Justice Jacobs said:
Our law looks with some disfavor upon actions in the nature of malicious prosecution and places upon the plaintiff the responsibility of proving not only lack of probable cause but also actual malice and special injury. See Mayflower Industries v. Thor Corp., 15 N.J. Super. 139, 151 (Ch.Div. 1951), affirmed 9 N.J. 605 (1952). But our law does not wholly prohibit such actions and the interests of justice do not suggest that it should. To the contrary, Dean Prosser, in his discussion of actions for the wrongful institution of civil proceedings, has pointed out that "there is no policy in favor of vexatious suits known to be groundless, which are a real and often a serious injury; and the heavy burden of proof upon the plaintiff, to establish both lack of probable cause and an improper purpose, should afford sufficient protection to the bona fide litigant and adequate safeguard against a series of actions." Prosser, Torts, 886 (1941). [18 N.J. 280 at 287]
*80 Justice Jacobs added that the majority opinion
... announces the far-reaching doctrine that ethics proceedings are absolutely privileged and that an attorney has no individual redress no matter how patently false and malicious is the charge against him or how grossly hurtful is the wrong committed against him. No supporting decisions are cited; indeed, the decisions which are cited all lend persuasive support to the contrary view. [Id. at 288]
Justice Jacobs continued by stating that
Attorneys-at-law have aptly been described as professional men who follow a common calling in a spirit of public service and nonetheless so because they thereby earn their livelihood. Throughout our country's history they have been in the forefront in promoting the public welfare and much is owed them for their ever continuing leadership in defense of democratic institutions. They play a vital part in our judicial system which displays such high solicitude for civil liberties and individual rights and, while they are periodically subject as a class to false attacks, they readily withstand them by adherence to their dedicated task of furthering the interests of justice. But when these attacks become irresponsibly malicious and individualized they wrongfully place in jeopardy the reputation and very livelihood of the particular practitioner involved; and while the individual attorney is entitled to no greater judicial protection under these circumstances than the law affords to those who follow other professions and occupations, he is, in all justice, entitled to no less. The contrary holding, that those who devote so much of their lives towards attaining equal protection under law for others should be denied it for themselves, seems ironic indeed. The notion that the granting of protection to the individual attorney might impair the public interest by discouraging disclosures of misconduct, seems to have little substance. [Id. at 290]
The majority opinion in Toft does not lack for critics. Professor Cowan of Rutgers Law School concluded that it was "manifestly unjust and should be disavowed." Cowan, "Torts, Annual Survey of the Law of New Jersey," 10 Rutg.L.Rev. 115, 129 (1955). When the statute in question was subsequently passed, Professor Cowan wrote as to the constitutionality of the statute that

*81 Since the statute makes an attempt to regulate the effect of proceedings before Ethics and Grievance Committees, and since these bodies are part of the judicial branch of the government, the constitutional issue of interference with the judiciary by the legislature may be raised. If so, it should be quickly settled in favor of the legislation. The interference is indirect and minimal. The branches of government are called on to cooperate with one another. Not every extension of legislative control into the business of the judiciary should be resented. The branches cannot stand alone. For their proper functioning, they need checks and balances. The courts should hesitate to set aside the legislative will in this instance. [Cowan, "Torts, Annual Survey of the Law of New Jersey," 11 Rutg.L.Rev. 160, 163 (1956)]
The majority opinion in Toft has been criticized in a number of other law reviews. Note, 34 Chi.-Kent L.Rev. 324 (1956); Note, 24 Fordham L.Rev. 479 (1955), and Note, 69 Harv.L.Rev. 375 (1955). The author of the case comment in the Harvard Law Review, points out that "[s]ince courts have greatly restricted the action for malicious prosecution ... a bona fide complainant is already well protected, and it would not seem necessary to create an absolute privilege." Id. at 376. The author of the comment in the Fordham Law Review, said:
The instant case is unique in granting a privilege to a general class of persons having no official capacity. It singles out the legal profession for a peculiar form of policing. Attorneys themselves are not privileged against malicious prosecution, even when acting at the instigation of their client in bringing a malicious suit. The reason of public policy advanced by the majority gives one pause when it is considered that doctors, pharmacists, teachers and myriad other persons whose professions equally affect the public weal are not barred from suing those who maliciously accuse them of delinquency. [Id. at 479]
The author of the case comment in the Chicago-Kent Law Review contended that the decision denies to attorneys the equal protection of the laws in violation of the 14th Amendment of the United States Constitution. That issue, however, has not been raised in this case.
Judicial approbation of Toft has been muted. Toft has been cited by a number of New Jersey cases, but for other points. Toft's reception elsewhere has been similarly underwhelming. *82 In 25 years only two courts, a New York and a Florida court, have followed Toft: Sullivan v. Cresonia, 54 Misc.2d 478, 283 N.Y.S.2d 62 (Sup.Ct. 1967), and Stone v. Rosen, 348 So.2d 387 (Fla.Ct.App. 1977). Moreover, Illinois recently declined to rule on the adoption of the Toft rule, noting that Toft has been extensively criticized. Alswang v. Claybon, 40 Ill. App.3d 147, 351 N.E.2d 285 (1976). See, also, Madda v. Reliance Ins. Co., 53 Ill. App.3d 67, 11 Ill.Dec. 29, 368 N.E.2d 580 (1977).
The present viability of Toft is dubious. The court in Toft split four to three. None of those seven Justices are presently on the court. In the quarter of a century that has elapsed since Toft many changes have occurred in the discipline of attorneys. Our Supreme Court has moved vigorously to improve procedures for ridding the legal profession of unfit and incompetent attorneys. For example, the court has established a statewide disciplinary review board composed of both attorneys and nonattorneys. The Supreme Court has approved, effective April 1, 1979, the appointment of additional lay persons so that each of the district ethics committees will have at least 25% public membership. See Annual Report, Administrative Director of the Courts of N.J., at 48 (1978-79).
These and other improvements have improved the quality and competence of the Bar. In such a setting, to deny maliciously injured attorneys their own day in court seems an unnecessary anachronism, not a necessary adjunct to the disciplinary authority of the court.
Furthermore, even those who favor the strictest observance of high ethical standards for attorneys and the sternest discipline for transgressors must find incongruous the fact that of all of the professions, only attorneys may not bring malicious prosecution suits. The public also suffers at the hands of unethical and incompetent physicians, accountants, realtors and members of other professions. Is not the need for disciplining these professionals *83 equally as great? An unfit physician can cause as much, if not more, harm than an unfit lawyer. Yet physicians and other professionals are not barred from seeking redress against those who pursue false and malicious claims against them.
One final consideration has potent force. To sustain defendant's position the judiciary must strike down a statute on the ground the Legislature has encroached on the judicial preserve. Such a conclusion should be reached only with the greatest of caution and restraint. For in taking such drastic action the judiciary fishes in the troubled waters of relations between coequal branches of government. A whirlpool of controversy continues to swirl as to whether the judiciary in recent years has impinged upon the prerogatives of the other two separate but equal branches of government. See Government by Judiciary, the Transformation of the 14th Amendment, by Professor Raoul Berger (1977). It is one thing for the judiciary to carry out its time-honored responsibility to declare statutes unconstitutional because they step on the constitutional rights of the people. It is far different for the judiciary to declare such statutes unconstitutional because they step on the perhaps too tender toes of the judiciary. Such issues are delicate and sensitive, ones which should be approached gingerly. Compare, In re Court Budget and Court Personnel, Essex County, 81 N.J. 494, 497 (1980).
This sensitivity is illustrated by the various opinions in Busik v. Levine, 63 N.J. 351 (1973), app. dism. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733. In that case the Supreme Court of New Jersey grappled with the issue of whether it could constitutionally authorize prejudgment interest by court rule. A majority of the court upheld the court rule but did not decide whether the matter was exclusively within the court's jurisdiction and, therefore, under the dictum in Winberry v. Salsbury, 5 N.J. 240 *84 (1950), cert. den. 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950), beyond the authority of the Legislature. As to that question, Chief Justice Weintraub said:
We see no need to meet that issue. The sole question is whether the Court may treat the subject by rule rather than by a judicial decision despite the substantive aspect of the subject. The issue of exclusivity involves a touchy matter, the relations among the three branches of government. It will be time enough to talk about exclusivity when there is an impasse and no way around it. A coordinate branch of government should not invite a test of strength by proclamation. Our form of government works best when all branches avoid staking out the boundaries which separate their powers. [Busik v. Levine, supra at 373]
The Chief Justice in Busik also spoke of the reluctance of the judiciary to move or to go far in areas in which the Legislature is competent to act. Id. at 366. He emphasized and reemphasized that the Legislature had not yet acted in the area of prejudgment interest. Id. at 360. He pointed out that in the past, when the Legislature has acted, even in areas where the court claimed exclusivity, the court has accepted the legislation. Id. at 373. The Chief Justice also noted that the court had not pursued to a "deadlock" the question of whether evidence rules were within the court's exclusive domain, but had instead participated in a process of cooperation and joint endeavor. Id. at 368. Four Justices in Busik, two concurring and two dissenting, placed even greater emphasis on avoiding constitutional confrontations in the field of legislative-judicial authority. Conford, P.J.A.D. (temporarily assigned), dissenting, Id. at 376; Hall, J., and Sullivan, J., concurring, Id. at 374; Mountain, J., dissenting, Id. at 385. Judge Conford urged "judicial moderation in selecting subject matter from rulemaking, with an eye toward avoiding areas heavily laden with such substantive aspects, deeply interlaced with pervasive public policy...." Id. at 380. Justices Hall and Sullivan said it would be more appropriate for court rules in "overlapping areas to be worked out in advance cooperatively between the three branches of government, as was done so successfully in the case of the *85 evidence rules." Id. at 375. Justice Mountain was of the view the court should "defer to the legislature if the matter under consideration can in any clear way be deemed to affect substantive law. There should be a studied deference to what I believe to be a legislative supremacy in all such matters." Id. at 389.
Thus all the justices in Busik recognized the great importance of avoiding constitutional confrontations in those border areas where judicial and legislative authority rub and scratch. Yet defendant in this case urges the opposite course. His position would require the judiciary to press to the edge of the rim, to stake out the boundaries of the judicial preserve, and to post "keep out" signs. Moreover, this would have to be done in an area involving the creation, or rather restoration, of a tort cause of action, an area in which the Legislature clearly has the authority to act and has acted by choosing a policy which is supportable and persuasive. See Justice Jacobs' concurring opinion in Toft, supra at 287. Defendant would invite a legislative-judicial test of strength as to what is the best public policy. Yet, public policy is a field in which the people's representatives should hold the final word. Two Guys from Harrison v. Furman, 32 N.J. 199, 229 (1960).
In support of his position defendant relies on the decision of the Supreme Court of Oregon in Ramstead v. Morgan, 219 Or. 383, 347 P.2d 594 (1959). In that case the Oregon Legislature enacted a statute which gave tort immunity to a person who "in good faith made a complaint as to the conduct of an attorney...." Id. 347 P.2d at 600; emphasis supplied. Plaintiff's attorneys brought a libel action. The alleged libelous statements were contained in a letter written to an Oregon State Bar Grievance Committee. The Oregon Supreme Court held that the letter was absolutely privileged, and that the statute was unconstitutional because it was a "serious incursion into the exclusive domain of this court [with regard to the discipline of members of the Bar]." Id. at 601.
*86 Defendant in the present case contends that the Ramstead case is authority for the proposition that the Legislature may not constitutionally permit an attorney to bring a malicious prosecution action against one who files an ethics complaint against him. This is a misreading of the case. In Ramstead the Oregon Bar Association, as amicus curiae, suggested that the term "good faith" in the statute did not mean that the Legislature was limiting the complainant's absolute privilege in a libel action, "but was inserted in the statute to preserve to the person defamed his common law action for malicious prosecution." Id. at 600. In response, the Supreme Court of Oregon in Ramstead said that "[s]ome support for this position can be found in the fact that at the time of the enactment of [the statute] there were adjudicated cases recognizing the right of a defamed person to recover in an action of malicious prosecution even though an action for defamation was not available because of the absolute nature of the privilege." Id. at 600. The court quoted from Albertson v. Raboff, 46 Cal.2d 375, 295 P.2d 405, 410 (Sup.Ct. 1956), in which the California court said:
... it may be noted at the outset that the fact a communication may be absolutely privileged for the purposes of a defamation action does not prevent its being an element of an action for malicious prosecution in a proper case. The policy of encouraging free access to the courts that underlies the absolute privilege applicable in defamation actions is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied. [Citations omitted]. [Ramstead, supra at 601.]
The Ramstead court did not differ with the opinion in Albertson, i.e., that a malicious prosecution action could still lie even though the communication was absolutely privileged for the purpose of a libel action. The Ramstead court concluded, however, that the Oregon Legislature did not intend the term "in good faith" to mean only that malicious prosecution actions were preserved. The Ramstead court said that "we think that the legislature, in clearly separating the other classes given an *87 unqualified immunity from those who file a complaint alleging misconduct, evinced the intention to limit the privilege of complainants." Id. at 601. The statute gave other participants in the grievance proceeding  for example, the officers of the state bar and the members of the ethics committee  the same privileges and immunities from civil proceedings which were possessed by the prosecuting and judicial officers of the state. Thus, the Oregon Supreme Court concluded in Ramstead that the Legislature had intended to water down in a libel action, the common law absolute privilege of a complainant before an ethics committee. Such legislation, the court said, was an undue interference with the authority of the judiciary to regulate the conduct of attorneys.
A similar issue would arise in this case if the New Jersey Legislature had attempted to provide that in libel cases the complainant before an ethics committee would have only a qualified privilege while other participants in the proceeding would retain the common law absolute privilege. It can be readily seen that this type of discriminatory emasculation of the protection afforded by the common law to those who complain of conduct of attorneys might well be offensive to the policy and duty of the court to maintain high standards among members of the Bar. However, the Legislature in New Jersey did not so revoke that common law protection. Instead, the Legislature restored to attorneys their common law protection to the same extent and in the same manner as that of other professionals.
Thus, as the above analysis indicates, the court in Ramstead was dealing only with libel and was not passing upon a common law malicious prosecution action. In fact, the court in Ramstead cited a number of cases in addition to Albertson in which such a malicious prosecution action would lie. The opinion of the Oregon court is comprehensive and scholarly. If there was any intention on the part of the court in Ramstead to go beyond the issues present in that case and to hold that malicious prosecution *88 actions by attorneys would be barred, then surely the court would have relied on the majority opinion of Chief Justice Vanderbilt in Toft v. Ketchum, supra, decided only four years previously. Yet the Toft case is not discussed or even cited by the Oregon Supreme Court. Hence, the Ramstead case stands only for the proposition that in a libel action by an attorney, the legislature cannot cut down the common law absolute privilege of the writer of a communication to a bar association ethics committee.
I am satisfied that defendant in this case has not met his formidable burden of establishing the unconstitutionality of N.J.S.A. 2A:47A-1. The Legislature in this case was acting within its proper sphere of authority in restoring a common law cause of action. A strong presumption of constitutionality attaches to this legislative action. The statute's alleged repugnancy to the Constitution is not clear beyond a reasonable doubt. The statute deals with "policy matters [which] are the exclusive responsibility of the legislative branch of government." Two Guys from Harrison, Inc. v. Furman, supra at 229. The effect of the statute, if any, on the disciplining of a member of the Bar is indirect, unclear and reasonably debatable. The statute does not encroach upon or usurp judicial authority over disciplining members of the Bar, or attempt to regulate their admission, practice or expulsion.
It is questionable whether the policy reasons underlying the majority opinion in Toft remain persuasive today. But in any event, the Legislature, in reversing the policy set down by the majority in Toft, has not invaded the judicial province. Undoubtedly, many legislative enactments have some impact on areas in which the judiciary is given constitutional authority. But this is no excuse for the judiciary in every such case to man the battlements and repel the invader. Coordination, cooperation and accommodation among the separate branches of government must prevail if our democratic Republic is to function effectively. Courts should avoid, and not embrace, collisions with the Legislature.
*89 The coequal branches do not exist or operate in watertight compartments. Masset Building Co. v. Bennett, 4 N.J. 53, 57 (1950). Contact, overlapping and even friction must necessarily occur, and, in fact, were designed to occur. The genius of our founding fathers was in their diffusing power among the branches of government so that unchecked power and its resulting tyranny would never plague the United States. David v. Vesta, 45 N.J. 301, 326 (1965).
Clashes, conflicts and confrontations are constant concomitants of diffused power. But our founding fathers hoped and planned that the good sense, restraint and forebearance of the participants would still the dissonance and produce a rough harmony. Declaring this statute unconstitutional would in my judgment be an abdication of judicial restraint and forebearance as well as a failure to show the due deference which must be accorded to a coequal branch of government.
I conclude, therefore, that the statute is constitutional and an action under the statute for malicious prosecution will lie. Defendant conceded at oral argument that if the statute is constitutional, factual issues exist. Hence, defendant's motion for summary judgment as to count 3, the malicious prosecution claim, is denied.
As to count 2 for libel, plaintiff conceded at oral argument that the only libel was in the complaint filed with the Ethics Committee. The contents of such a complaint are absolutely privileged in a libel action. Wong v. Schoor, 51 Hawaii 608, 466 P.2d 441 (Sup.Ct. 1970); Sinnett v. Albert, 188 Neb. 176, 195 N.W.2d 506 (Sup.Ct. 1972); Wiener v. Weintraub, 22 N.Y.2d 330, 292 N.Y.S.2d 667, 239 N.E.2d 540 (Ct.App. 1968); Albertson v. Raboff, supra; Prosser on Torts, 780, 781 (1971). See, also, J.D. Const. Corp. v. Isaacs, 95 N.J. Super. 122 (App.Div. 1967) rev'd 51 N.J. 263 (1968); 50 Am.Jur.2d, Libel and Slander, § 235.
The motion for summary judgment as to count 2, the libel count, is granted.