IN THE MATTER OF THE HEARING ON IMMUNITY FOR ETHICS COMPLAINANTS.

Argued October 11, 1983—Decided July 3, 1984.

*William J. Brennan, III,* argued the cause for New Jersey State Bar Association.

*August C. Michaelis* argued the cause *pro se.*

*Martin Sarver* argued the cause *pro se.*

*Irwin I. Kimmelman,* Attorney General of New Jersey, argued the cause *pro se* (*Irwin I. Kimmelman,* attorney; *Irwin I. Kimmelman* and *Michael R. Cole,* Assistant Attorney General, of counsel; *William Harla,* Deputy Attorney General, on the brief).

*Joseph H. Rodriguez,* Public Advocate, argued the cause *pro se* (*Joseph H. Rodriguez,* attorney; *Richard E. Shapiro,* Director, Division of Public Interest Advocacy, on the letter brief).

*Colette A. Coolbaugh,* Assistant Director, argued the cause for Division of Ethics and Professional Services.

The opinion of the Court was delivered by

WILENTZ, C.J.

On January 31, 1984, the Court adopted various rules concerning attorney discipline. One of those rules provides that any grievant in an ethics matter or client in a fee arbitration case shall be absolutely immune from suit for testimony or communications given or made in connection with the fee arbitration or ethics proceeding. The Rule would effectively bar libel and slander suits, for instance, as well as malicious prosecution suits. The Rule's text follows:

(b) Immunity for Grievants and Clients.

Grievants in ethics matters and clients in fee arbitration cases shall be absolutely immune from suit, whether legal or equitable in nature, for all communications to Committees, Fee Committees, the Director, the Board, or to appropriate staff and for testimony given in ethics or fee arbitration proceedings. This immunity shall not extend to any publication or distribution of information by a grievant or client that violates R.1:20–10.[1] [*R.*1:20–11(b) ].

The Court, being seriously divided on the wisdom of the Rule, decided that, instead of an official Commentary, it would issue what amounts to a majority opinion and a dissenting opinion.

The Rule's modern history goes back to *Toft v. Ketchum,* 18 *N.J.* 280, *cert.* den., 350 *U.S.* 887, 76 *S.Ct.* 141, 100 *L.Ed.* 782 (1955). The Court, by a 4–1–2 vote, held that a complainant in an ethics matter was immune from a malicious prosecution suit by the attorney under circumstances in which the suit would clearly otherwise have been sustainable. The reasoning of the majority was that the strong public policy in favor of maintaining strict adherence to the rules of discipline required the removal of any impediment to the effective functioning of the disciplinary system; allowing complainants to be potentially vulnerable to lawsuits brought by attorneys against whom they

[1]Rule 1:20–10 outlines the confidentiality requirements for ethics proceedings.

complained was deemed to be such an impediment. The Court noted that while subjecting the complainant to suit might help snuff out some maliciously motivated complaints, it was also quite possible that legitimate complaints would similarly be chilled. The public policy considerations making unacceptable any such chilling effect were deemed important enough to overcome the well-founded arguments against such immunity, such as: that it is unfair to deprive lawyers of the protection from malicious lawsuits accorded to the rest of the population; that the potential harm to an attorney's reputation and career from such groundless complaints is great; that the very high threshold that an attorney must clear to sustain a malicious prosecution suit already affords complainants sufficient protection and should eliminate any apprehension about filing justifiable complaints; and that the immunization of complainants will encourage the public to abuse attorney grievance procedures.

Within a year, obviously in response to *Toft*, the Legislature passed *N.J.S.A.* 2A:47A-1 (*L.*1956, *c.* 122). The statute expressly allows a malicious prosecution action to be brought against the complainant by an attorney who is the subject of an ethics complaint. The statute was challenged only once prior to 1980, and the question of its constitutionality was not resolved in that case. *See Black v. Keoner,* 44 *N.J.* 140, 141 (1965). *N.J.S.A.* 2A:47A-1 was again challenged as unconstitutional in a case in which Judge Humphreys held that the legislation did not conflict with the Supreme Court's exclusive power over the discipline of attorneys, and that it was otherwise constitutionally valid. The malicious prosecution action in that case was allowed to stand. There was no appeal taken. *Friedland v. Podhoretz,* 174 *N.J.Super.* 73 (Law Div.1980).

In 1982 this Court appointed a committee to study our disciplinary structure, chaired by retired Justice Mark A. Sullivan. In the Committee's report was a discussion of a proposed rule

that would, in effect, reinstate the rule of *Toft* in this state: namely, a rule that would grant any ethics complainant immunity from suit by the lawyer against whom a complaint is made. Justice Sullivan's committee divided equally on the issue, the members opposing such rule also being of the opinion that, in any event, the matter should not be treated by rule-making but rather should be disposed of when and if it should come before the Court in litigation. As a result of that report, the Court proposed the adoption of such a Rule but instead of soliciting comments, we ordered oral argument. The New Jersey State Bar Association briefed the issues and presented oral argument in opposition to the adoption of the Rule; the Division of Ethics and Professional Services appeared in support of the Rule. Thereafter the Court voted, 4–3, to adopt it.

The arguments on this issue, and probably the societal considerations, have changed very little if at all since it first became a subject of debate. While we are tempted to say that the Court's determination to have as effective a disciplinary system as possible has never been stronger, it is hard to believe that that determination is any stronger with us than it was with the former members of the Supreme Court in 1956 (and thereafter) when, after the Legislature reinstated an attorney's right to sue a malicious ethics complainant, the Court took no action whatsoever.

We do believe, however, that as a result of many factors the public is much more aware of and concerned with matters affecting the bar and the bench, somewhat more involved with attorneys (there are presently 26,199 lawyers as compared to 13,909 a decade ago), and especially more aware of the existence of ethics committees and the public's right to complain when they believe attorneys have not acted properly. Our belief is buttressed by the fact that ethics complaints have

constantly grown in recent years, even apparently outstripping the growth in the number of lawyers in the state.[2]

Obviously these facts could be used to support the opposite conclusion, on the ground that the rule allowing suit by the attorney against the malicious complainant has apparently had no chilling effect whatsoever, or very little; otherwise, one might say, we would not have so many complaints filed at an accelerating pace. The truth, of course, is that neither the majority nor the minority has any significant hard facts to back up the conclusion that the potential for such suits is in fact chilling complainants who would otherwise act or is, in fact, having no such effect. In any event, the matter is too important, the policy considerations involved too obvious and too conflicting to allow a determination to be based on some theory under which the majority has the burden to prove the factual need for such a rule or the minority has the burden of proving that the absence of such a rule has had no adverse effect. There is simply a gap in knowledge with which both sides have to contend.

We recognize the persuasiveness of the contention that lawyers are to some extent made "second-class citizens" by virtue of such a rule. At the same time it is likely, in fact, that little damage in the form of blemished reputations will be suffered by attorneys. In the overwhelming proportion of cases, the fact of the complaint and its disposition will remain private (that being the rule of our Court when a complaint is dismissed practically at its inception as being totally frivolous); the only real damage will be the anxiety and insult experienced by the lawyer. In some cases the matter will not remain private because malicious complainants are the most likely to violate a

---

[2]In the last five years, during which the number of attorneys has increased by 33% from 19,725 to 26,199, the number of fee arbitration and ethics complaints has grown from 1,322 per year to 2,067 per year, a 56% increase.

requirement of confidentiality.[3] We are of course concerned with the plight that attorneys sometimes experience in these matters. However, the apparent rarity with which attorneys have availed themselves of *N.J.S.A.* 2A:47A–1 suggests that the damage suffered is minimal. While this absence of lawsuits may also reflect the law's success in deterring malicious complainants, we are particularly concerned that it may be having an unintended impact as well, deterring non-malicious potential complainants along with the maliciously inspired.

The ability of attorneys effectively to muzzle potential complainants should not be underestimated. The formal filing of ethics complaints rarely represents the first occasion on which the attorney involved has heard about them. There is almost invariably a succession of letters, phone calls, threats, and demands by the potential complainant before any ethics complaint is filed. There are many opportunities during this period for the attorney to make it clear that if such complaint is filed, the attorney will sue in response, using all the power of the office of attorney to bring about the justice that the attorney feels is his or her due. The attorney will charge the complainant with libel, slander, malicious prosecution, etc., because that is what the lawyer may believe is involved; and the complainant will be informed of all this early enough to persuade him not to file a complaint.

The potential for intimidation is obvious, for complainants know that lawyers are fully capable, through their own personal means, without substantial expenditure, to prosecute such litigation. The complainant's certainty of expense in defending same, plus the risk, however remote, of being held liable is enough to make some potential complainants change their minds. Whether this has happened, is happening, or is likely to happen is less important to us than our belief that it should

---

[3]The Rule explicitly allows a defamation suit based on a complainant's statement made in violation of the confidentiality requirement of Rule 1:20–10.

never happen. We should not tolerate the possibility within our disciplinary system that a potential ethics complainant may be intimidated by an attorney into not filing a complaint. The need for public confidence in the integrity of that system is much too important.

At least seventeen other jurisdictions have come to similar conclusions, providing an absolute privilege for complaints and testimony in ethics proceedings or according complainants immunity from suit, through court rules, statutes, or rules on attorney discipline.[4] We also note five jurisdictions that provide what might be called "qualified" immunity or privilege,[5] and one in which such an immunity has been proposed.[6] Five other states have judicial precedents establishing either an

---

[4]Alaska Att'y Rules, Disciplinary Enforcement Rule 9 (Supp.1983); Ariz. Rules Regulating Conduct of Att'ys, Rule XII (Michie Supp.1983); Colo.R.C.P. Rule 259(C) (Michie Supp.1983); *Stone v. Rosen,* 348 *So.*2d 387 (Fla.Dist.Ct. App. 3 1977); Ga.Code App. to Title 9, Part IV, State Bar Rule 4–220(g) (Harrison Supp.1982); Hawaii S.Ct.Rule 16.8 (1979); La.Rev.Stat.Ann. § 37 ch. 4 App., Art. of Incorp. of La.State Bar Ass'n, Art. 15 § 13 (West Supp.1983); Minn.Rules on Law: Prof.Resp., Rule 21 (1977); Miss.Code Ann. § 73–3–345 (1982); *Sullivan v. Crisona,* 54 *Misc.*2d 478, 283 *N.Y.S.*2d 62 (Sup.Ct.1967) (interpreting N.Y.Judiciary Law § 90); N.D.Cent.Code § 27–14–03 (1974); Okla.Ct.Rules Governing Disciplinary Proc., Rules 14 & 54 (1983–84); Or.Rev. Stat. § 9.550(3) (1977) (immunity does not extend to perjury proceeding); S.C.Rules on Disciplinary Procedure for Att'ys §§ 11, 26 (Lawyers Coop.Supp. 1983) (complainants may be subject to contempt sanctions and injunction against malicious filing, but privilege prevents lawsuits predicated on filing or testimony); S.D.Codified Laws Ann. § 16–19–30 (1979); W.Va.State Bar By-laws Art. VI § 43 (1982); Wyo.Ct.Rules, Disciplinary Code for the Wyo.State Bar, Rule VI (1973).

[5]Ind.S.Ct.Rules Part VI, Admission & Discipline Rule 23 § 20 (1983) (immunity in absence of malice); Kan.S.Ct.Rule 223 (same privilege as attaches in other judicial proceedings); Me.Bar Rule 7(f)(1) (1983) (immunity in absence of malice); Neb.S.Ct.Rule 106 (1983) (absolute privilege for good faith complainant); *In re Proposed Rules Relating to Grievance Pro.,* 115 *N.H.* 310, 341 *A.* 2d 272 (1975) (approving proposed rules effective July 25, 1975, Rule 10 providing immunity for statements made in good faith).

[6]Proposed Michigan Court Rule 9.125 (1984) (immunity in absence of malice).

absolute or a qualified privilege for complaints in the context of libel actions specifically.[7]

Under English common law, the "absolute privilege" from defamation actions that attaches to all statements and testimony by witnesses, judges, and parties in the course of any judicial proceeding has been held to apply to testimony and statements made in the course of solicitor disciplinary proceedings. *Addis v. Crocker* [1961] 1 Q.B. 11, 2 All E.R. 629 C.A. *See Halisbury's Laws of England*, Libel and Slander 28:98–101. *But cf. Lincoln v. Daniels*, [1962] 1 Q.B. 237, 3 All E.R. 740 C.A. (communication to Secretary of Bar Council that was not within official channels for disciplinary action held not privileged).[8]

We are of course concerned that our action in effect invalidates a statute. We ordinarily do our very best to harmonize our constitutional powers with the apparently conflicting will of the Legislature. *Passaic Cty. Probation Officers Ass'n v. County of Passaic*, 73 *N.J.* 247, 255 (1977); *see Knight v.*

---

[7]*Katz v. Rosen*, 48 *Cal.App.*3d 1032, 121 *Cal.Rptr.* 853 (Ct.App.Dist.1975) (interpreting Cal.Civ.Code § 47); *Kerpelman v. Bricker*, 23 *Md.App.*2d 628, 329 *A.*2d 423 (Ct.Sp.App.1974); *Lee v. W.E. Fuetterer Battery & Supplies Co.*, 323 *Mo.* 1204, 23 *S.W.*2d 45 (1929); *Baggott v. Hughes*, 34 *Ohio Misc.* 63, 296 *N.E.*2d 696 (Ct.Comm.Pleas 1973); *McAfee v. Fedder*, 452 *S.W.*2d 56 (Tex.Civ.App. 1970).

[8]Whether the privilege in England also protects a witness or complainant from an action in malicious prosecution is not clear. However, in the leading case that establishes the privilege as to defamation actions, the argument was rejected that a witness might nevertheless be held liable for the statements in question in "another and different form of action on the case, namely an action analogous to an action for malicious prosecution." *Munster v. Lamb* [1883] 11 Q.B.D. 588, 601–02. The policies outlined in support of that decision are much the same as those that we rely on in endorsing Rule 1:20–11(b) today. *But cf. Lilley v. Roney* [1892] 61 L.J.Q.B.D. 727 (affidavit and letter initiating a disciplinary proceeding privileged as to libel action but not as to use in malicious prosecution suit), and *Roy v. Prior*, 1971 A.C. 470 [1970] 2 All E.R. 729 H.L. (privilege not applicable to witness who gave evidence in support of bench warrant's issue, the gist of the action being malicious abuse of process rather than giving of false evidence).

*Margate,* 86 *N.J.* 374, 391 (1978) (Court may accommodate legislative action bearing on the judiciary as long as legislation serves legitimate governmental purpose and does not interfere with the Court's constitutional interests in the area). This is one area, however, in which our constitutional responsibility is so clear as to leave no doubt of our duty to adopt a rule that we think is needed, despite its clear conflict with existing legislation. This Court simply cannot in the least abdicate its responsibility to exercise exclusive power over the disciplining of attorneys. While the dissenters are probably correct in their assertion that there is no showing that such a statute has had any substantial impact on disciplinary proceedings, we do not believe that is the test that should be applied. This is a matter committed solely to us by the Constitution. Whether the legislative intrusion is minimal or important is, it seems to us, irrelevant. We are not the moderators or mediators of conflicting factions who argue about the wisdom of our rules concerning discipline. We are fully and exclusively responsible for that subject, and while the point of view of the Legislature is always to be given appropriate deference, it would be wholly inappropriate here if, after considering it and disagreeing with it, we were nonetheless to adhere to it.

Sometimes a rule is adopted not as a matter of practical expediency but as a matter of principle. That is the case here. If the bar and the bench attempt to view the disciplinary structure objectively they will find, we believe, that we have asked for a great deal of trust on the part of the public. While we now have public members sitting on every district ethics committee and on the Disciplinary Review Board, the fact is that the majority of the members are attorneys. Attorneys, to some extent friendly with, close to, and economically involved with other attorneys of the district, are entrusted with handling the most important step in the disciplinary process: the screening, investigation, and initial factual prosecution of a complaint.

We ask the public to trust and believe that justice is being done, for it must be trust and belief since in the majority of

cases the public does not know that a complaint has been made or how it is disposed of, and certainly does not know when it is dismissed. We ask them to trust a system in which the initial proceedings and the initial appellate review are dominated by lawyers in its dispensation of discipline to other lawyers. We believe there *is* substantial trust, attributable to some extent to the presence of public members on every district ethics committee, to the fact that it is known that there is an appeal available to the Disciplinary Review Board consisting of the most highly respected citizens (judges, lawyers, and public members), and a further appeal to this Court, almost all of whose proceedings are public. We believe the public by now is aware of the fact that we are very strict not only in our ethical rules but in our implementation and enforcement of them. Why jeopardize that trust in the very least by allowing even one citizen to be sued on account of a complaint made against a lawyer, by allowing even one citizen to be threatened with such suit, or by publicly asserting, through a statute, that such a threat can be made good? Is the damage, or the potential damage, to the bar so great that it cannot suffer the infrequent consequences of such a malicious complaint in order to assure even greater confidence in the system than now exists? (And here we refer not only to confidence in our disciplinary structure, a confidence that could easily be eroded, but to confidence in general in both the bar and the bench.)

We conclude that the potential damage from the adoption of Rule 1:20–11(b) is far outweighed by the benefits to be gained: the enhancement of public confidence and the added assurance that our attorney disciplinary system effectively protects the public interest.

CLIFFORD, POLLOCK and GARIBALDI, JJ., dissenting.

In the face of so balanced, so fair, so dispassionate a presentation of the contending points of view as is found in the majority opinion, one is hard-pressed to wax indignant. Ordi-

narily, a decision that unfairly demeans lawyers, unnecessarily demoralizes the bar, and unwisely produces a cheeky overriding of a long-standing legislative policy might otherwise invite a touch of bombast, maybe a little withering scorn here, some acceptable hyperbole there. But by its measured articulation of our position the Court's opinion has effectively taken the wind out of our sails. There is little to add.

This decision comes down, plainly and simply, to a judgment call. The question has been with us at least since *Toft v. Ketchum*, 18 *N.J.* 280, *cert.* denied, 350 *U.S.* 887, 76 *S.Ct.* 141, 100 *L.Ed.* 782 (1955), whose rule the Court now reinstates, and it has repeatedly been decided by the narrowest of margins—4–1–2 in *Toft*, 5–5 in Justice Sullivan's committee (see *ante* at 671–72), and today by a 4–3 vote. That record strongly suggests that reasonable people can reasonably arrive at opposite conclusions.

For us, the negatives of immunity for grievants in ethics matters and clients in fee arbitration cases outweigh the affirmatives. Acknowledging that we cannot say it better than he, we align ourselves with Justice Jacobs in *Toft, supra,* who reminds us that attorneys-at-law are professionals

> who follow a common calling in a spirit of public service and nonetheless so because they thereby earn their livelihood. Throughout our country's history they have been in the forefront in promoting the public welfare and much is owed them for their ever continuing leadership in defense of democratic institutions. They play a vital part in our judicial system which displays such high solicitude for civil liberties and individual rights and, while they are periodically subject as a class to false attacks, they readily withstand them by adherence to their dedicated task of furthering the interests of justice. But when these attacks become irresponsibly malicious and individualized they wrongfully place in jeopardy the reputation and very livelihood of the particular practitioner involved; and while the individual attorney is entitled to no greater judicial protection under these circumstances than the law affords to those who follow other professions and occupations, he is, in all justice, entitled to no less. The contrary holding, that those who devote so much of their lives towards attaining equal protection under law for others should be denied it for themselves, seems ironic indeed. [18 *N.J.* at 290 (Jacobs, J., concurring).]

We respectfully suggest that in its zeal to protect the public interest, the Court has gone too far and bent over backwards. The needs of the public are fully met in the qualified immunity afforded by *N.J.S.A.* 2A:47A–1, specifically designed to overcome the rule of *Toft.* The statute allows a lawyer to bring suit against an ethics complainant for malicious prosecution only when the lawyer has been accused "falsely and maliciously and without probable cause * * *." The impact of the Court's decision is to embrace a wholly contrary view: it deprives lawyers of recourse for the damage and indignity visited upon them by clients' complaints that are inspired by nothing more than pure malice and sheer viciousness. Surely we can attain our goal of public confidence in the bench and bar without adopting this extraordinary position.

We are inclined to agree that the Court has the power to adopt the Rule in question, but we question the wisdom of its exercise. A healthy respect for the Legislature, whose competence to make policy judgments concerning immunities no one questions, warrants our deferring to the legislative determination as expressed in *N.J.S.A.* 2A:47A–1. This is not the field on which to risk a confrontation with the Legislature—a confrontation predicated on the entirely unwarranted assumption that lawyers, at least as perceived by the public, are a shifty lot.

Judge Humphreys, in *Friedland v. Podhoretz*, 174 *N.J.Super.* 73, 81 (Law Div.1980), characterizes *Toft*'s reception in other jurisdictions as "underwhelming." Understandably so. Rule 1:20–11(b), which codifies *Toft*, strikes us as bad policy and just plain wrong. Hence, our votes against adoption of the Rule.

*For adoption of rule*—Chief Justice WILENTZ and Justices SCHREIBER, HANDLER and O'HERN—4.

*Opposed*—Justices CLIFFORD, POLLOCK and GARIBALDI —3.