FREDERICK R. BURKE, PLAINTIFF-RESPONDENT, v. JOHN J. DEINER, WARREN GLASER AND GEORGE BUONO, DEFENDANTS-APPELLANTS, AND ROSENTHAL AND ATTINGER, CERTIFIED PUBLIC ACCOUNTANTS, AND JAMES J. WINTERS, EDWARD REESE, HERBERT FENROW, ISADORE ATTINGER, INDIVIDUALLY AND AS EMPLOYEES OF ROSENTHAL AND ATTINGER, DEFENDANTS.

Argued April 2, 1984—Decided August 2, 1984.

466

*Joseph J. Benedict* argued the cause for appellants (*Benedict & Altman,* attorneys; *Harold P. Braff,* of counsel).

*Joseph R. Bulman* argued the cause for respondent (*Arthur W. Burgess*, attorney).

The opinion of the Court was delivered by

O'HERN, J.

The central issue in this appeal is whether municipal authority members have a qualified or an absolute privilege with respect to an allegedly defamatory resolution discharging the authority's executive director. We hold the privilege is a qualified one but find that the privilege has not been lost here since the record will not sustain a finding by clear and convincing proof that the authority members knew or had reason to question that the matters contained in the resolution were false.

Plaintiff, Frederick Burke, was hired as the Executive Director of the New Brunswick Parking Authority in 1971. In the summer of 1976, his daughter, an employee of the Authority, was charged with theft of receipts. The Authority asked its accountants, Rosenthal & Attinger, to conduct a special audit. Their audit report, entitled "Weaknesses and Deficiencies in Internal Control," reported ten deficiencies, including: cash receipts were not deposited daily; the use of cash register tapes had been discontinued; employees had taken funds home to count the receipts; and employees had cashed their payroll checks with daily cash collections. The auditors recommended specific changes in these fiscal practices.

Burke challenged this report at the September 14, 1976 meeting of the Authority. At the September 28 meeting, a majority of the Authority members voted to replace Rosenthal & Attinger with a new auditor. (That vote was rescinded at a later meeting.)

In October 1976, New Brunswick Mayor Richard Mulligan appointed the defendants Warren Glaser and George Buono to the Authority. On October 28, these two commissioners took office to serve with the three remaining commissioners, one of whom was the defendant John J. Deiner.

At that first meeting, the three defendants, Deiner, Glaser, and Buono, voted to adopt a resolution discharging Burke as Executive Director. Because Burke had an employment contract with the Authority, the discharge had to be for cause. Among the grounds justifying discharge was "[m]isappropriation or misuse of property of the Authority." In addition, Burke could be discharged for "inefficiencies in the discharge of his duties, first providing, those inefficiencies are set forth in writing and with particularity."

The resolution of October 28, 1976, set forth a variety of reasons for discharging Burke, including: the criminal charges pending against his daughter; the mayor's wish that he resign; and the presence of trash and debris on Authority property, which had led to citations from the Health Department. For our purposes, attention focused on the clause charging him with "negligent operation of the Parking Authority, which borders on misappropriation or misuse of the property of the Authority."

Pursuant to the terms of his contract, plaintiff sought reinstatement by court action within fifteen days. He was restored to duty with back pay in June 1977.

In August 1978, plaintiff filed a complaint against the Authority, all the commissioners, Rosenthal & Attinger, and its employees. All claims were dismissed before or at trial with the exception of the defamation claim against the three defendant commissioners, based upon the language of the resolution discharging Burke. The jury awarded plaintiff $2000 in compensatory damages for the injury to his reputation, and punitive damages against the defendants Deiner, Buono, and Glaser in the sums of $2000, $5000, and $11,000, The Appellate Division affirmed the judgment against the commissioners, rejecting their claim of absolute immunity. 190 *N.J. Super.* 382, 391 (1983). It reversed the dismissal of Burke's defamation action against Rosenthal & Attinger. It held that the accountants' privilege is qualified, but as critics of a public official the

accountants, too, are protected by the constitutional privilege of "actual malice." It remanded for a new trial on that claim but otherwise affirmed the trial court. *Id.* at 393.

We granted the defendant commissioners' petition for certification, 95 *N.J.* 201 (1983). The accountants have not appealed.

## I.

There are two concepts of immunity that we must consider in this case. The first is the general discretionary immunity that cloaks the public officer in the exercise of his or her duties; the second is the immunity that flows from the first amendment's guarantee of freedom of speech. *See* Jaffe, "Suits Against Governments and Officers: Damage Actions," 77 *Harv. L. Rev.* 209 (1963).

 The former concept is related to concepts of sovereign immunity. Professor Jaffe states that the "prototype of discretionary immunity has been that of the King's judge." *Id.* at 222. He wryly observes of the rationale for the rule: "[W]ere he not immune for his mistakes, 'no man but a beggar, or a fool, would be a Judge.' * * * But then what of police officers?"—or here we may ask, unpaid parking commissioners? *Id.* at 220 (quoting *Miller v. Hope*, 2 *Shaw, H.L.* 125, 134 (1824)).

This absolute privilege, judicial in origin, has been extended to executive and legislative officers. *Spalding v. Vilas*, 161 *U.S.* 483, 16 *S.Ct.* 631, 40 *L.Ed.* 780 (1896), granted absolute immunity to the Postmaster General. The Court found that the same considerations of public policy that impel judicial immunity apply to a large extent to official communications by heads of executive departments when engaged in the discharge of duties imposed on them by law. *Id.* at 498, 16 *S.Ct.* at 637, 40 *L.Ed.* at 785.

In *Gregoire v. Biddle*, 177 *F.*2d 579 (2d Cir.1949), *cert.* denied, 339 *U.S.* 949, 70 *S.Ct.* 803, 94 *L.Ed.* 1363 (1950), Judge Learned Hand extended the immunity to officers of the Depart-

ment of Justice engaged in the prosecution function. He likened their duties to judges and wrote that "to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." 177 *F.*2d at 581.

Although recognizing the absolute immunity of the President from liability for damages for an executive action, *Nixon v. Fitzgerald,* 457 *U.S.* 731, 102 *S.Ct.* 2690, 73 *L.Ed.*2d 349 (1982), of members of Congress, acting in their legislative capacity, *Dombrowski v. Eastland,* 387 *U.S.* 82, 87 *S.Ct.* 1425, 18 *L.Ed.* 2d 577 (1967), and of judges, in their judicial functions, *Stump v. Sparkman,* 435 *U.S.* 349, 98 *S.Ct.* 1099, 55 *L.Ed.*2d 331, (1978), *but see Pulliam v. Allen,* —— *U.S.* ——, 104 *S.Ct.* 1970, 80 *L.Ed.*2d 565 (1984) (immunity of judges qualified as to injunctive claims), the Supreme Court has held that absolute immunity is not without its limits:

> For executive officials in general, however, our cases make plain that qualified immunity represents the norm. In *Scheuer v. Rhodes,* 416 US 232, 40 L Ed 2d 90, 94 S Ct 1683, 71 Ohio Ops 2d 474 (1974), we acknowledged that high officials require greater protection than those with less complex discretionary responsibilities. Nonetheless, we held that a governor and his aides could receive the requisite protection from qualified or good-faith immunity. Id., at 247–248, 40 L Ed 2d 90, 94 S Ct 1683, [at 1691–1692], 71 Ohio Ops 2d 474. In *Butz v. Economou,* [438 *U.S.* 478, 98 *S.Ct.* 2894, 57 *L.Ed.*2d 895 (1978)], we extended the approach of Scheuer to high federal officials of the Executive Branch. Discussing in detail the considerations that also had underlain our decision in Scheuer, we explained that the recognition of a qualified immunity defense for high executives reflected an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, 438 US, at 504–505, 57 L Ed 2d 895, 98 S Ct 2894, [at 2909–2910], but also "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Id., at 506, 57 L Ed 2d 895, 98 S Ct 2894, [at 2911]. [*Harlow v. Fitzgerald,* 457 *U.S.* 800, 807, 102 *S.Ct.* 2727, [2733], 73 *L.Ed.*2d 396, 403–04 (1982).]

New Jersey law is similar, although our cases have construed the absolute privilege more narrowly. *See Cashen v. Spann,* 66 *N.J.* 541, *cert.* denied, 423 *U.S.* 829, 96 *S.Ct.* 48, 46 *L.Ed.*2d 46 (1975) (prosecutor's conduct not absolutely privileged); *Earl*

*v. Winne,* 14 *N.J.* 119 (1953); *DeGroot v. Muccio,* 115 *N.J. Super.* 15 (Law Div.1971). Chief Justice Hughes expressed our concepts:

[E]xecutive officers are entitled to immunity where they act in good faith, as defined by the [United States Supreme] Court:

"[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer v. Rhodes,* 416 *U.S.* 232, 247–248, 94 *S.Ct.* 1683 [1691–1692], 40 *L.Ed.*2d 90 (1974).

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

We note that such qualified immunity of a public body is concordant with New Jersey legislative policy as expressed in our Tort Claims Act \* \* \*. [*Nicoletta v. North Jersey Dist. Water Supply Comm'n,* 77 *N.J.* 145, 167–68 (1978).]

The Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, reestablished sovereign immunity except when there is a statutory declaration of liability. *See Bell v. Bell,* 83 *N.J.* 417, 423, 416 *A.*2d 829 (1980). Even under concepts of sovereign immunity in force prior to the adoption of the Tort Claims Act, it would have been arguable whether the parking commissioners were exercising a proprietary or a governmental function. *See Cloves v. Township of Delaware,* 23 *N.J.* 324 (1957). Courts must "realistically interpret both the statutory and common-law immunities in order to effectuate their intended scope." *Malloy v. State,* 76 *N.J.* 515, 519 (1978). Realistically interpreting common-law and statutory immunity in the context of an official exercise of the administrative functions of a municipal authority, we conclude that only a qualified immunity exists.

Our conclusion parallels the provisions of the Tort Claims Act that expressly immunize the public officer in the "exercise of judgment or discretion," *N.J.S.A.* 59:3–2(a), but qualify the immunity when the employee's conduct was "outside the scope of his employment or constituted a crime, actual fraud, actual

malice or willful misconduct." *N.J.S.A.* 59:3–14. In part II of this opinion, *infra* at 475–478, we shall discuss the reach of this qualified immunity.

Defendants' first amendment claims, although seemingly based on different principles, have the same root—the public interest in the effective exercise of governmental power: "Perhaps the largest single category of actions against officers is based on defamation of character, and in no area of the law of actions against officers is there greater difference of opinion among courts and lawyers as to the correct solution." Jaffe, *supra*, 77 *Harv.L.Rev.* at 232. The Supreme Court in *Barr v. Matteo*, 360 *U.S.* 564, 79 *S.Ct.* 1335, 3 *L.Ed.*2d 1434 (1959), sustained the absolute immunity of the Acting Director of the Office of Rent Stabilization against claims for defamation made by two employees arising out of a press release concerning their suspensions. Justice Harlan's plurality opinion built on the general principles of *Spalding v. Vilas*, and cited with approval Judge Learned Hand's articulation of the reasons for immunity in *Gregoire v. Biddle*, 360 *U.S.* at 570–73, 79 *S.Ct.* at 1338–41, 3 *L.Ed.*2d at 1440–42. Justice Black, writing separately, questioned "how far the Congress itself could go in barring federal officials and employees from discussing public matters consistently with the First Amendment." *Id.* at 577, 79 *S.Ct.* at 1342, 3 *L.Ed.*2d at 1445 (Black, J., concurring).

It was this concept that provided the crucial underpinning for *New York Times Co. v. Sullivan*, 376 *U.S.* 254, 282, 84 *S.Ct.* 710, 727, 11 *L.Ed.*2d 686, 707–08 (1964):

> Such a privilege for criticism of official conduct is appropriately analogous to the protection accorded a public official when *he* is sued for libel by a private citizen. In *Barr v Matteo*, 360 US 564, 575, 3 L Ed 2d 1434, 1443, 79 S Ct 1335 [1341], this Court held the utterance of a federal official to be absolutely privileged if made "within the outer perimeter" of his duties. The States accord the same immunity to statements of their highest officers, although some differentiate their lesser officials and qualify the privilege they enjoy. But all hold that all officials are protected unless actual malice can be proved. The reason for the official privilege is said to be that the threat of damage suits would otherwise "inhibit the fearless, vigorous, and effective administration of policies of government" and "dampen the ardor of all but the most resolute, or

the most irresponsible, in the unflinching discharge of their duties." *Barr v Matteo*, supra, 360 US, at 571 [79 *S.Ct.* at 1339], 3 L ed 2d at 1441. Analogous considerations support the privilege for the citizen-critic of government. It is as much his duty to criticize as it is the official's duty to administer. See *Whitney v California*, 274 US 357, 375, 71 L ed 1095, 1105, 47 S Ct 641 [648] (concurring opinion of Mr. Justice Brandeis) * * *. [(Footnotes omitted, emphasis in original).]

We recently re-emphasized that the central goal of our free speech decisions is "to guarantee the freedom of the press to inform a self-governing people." *Canino v. New York News, Inc.*, 96 *N.J.* 189, 197 (1984). We restated our " 'commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials'." *Id.* (quoting *New York Times v. Sullivan*, 376 *U.S.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701).

We do not believe that commitment to this principle will be weakened by qualifying the privilege in the case of municipal officials performing administrative functions. Our precedents have not favored absolute immunity for all official speech. Rather, our courts have granted absolute immunity in some settings, while qualifying it in others, depending on the presence of those policy reasons discussed above. For instance, unless an "administrative proceeding was actually conducted in [a] manner and with safeguards similar to a judicial proceeding," there is no basis for invoking absolute immunity. *Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 *N.J.* 552, 562 (1955) (holding statements in proceeding before Director of Milk Industry covered by same immunity as in judicial proceeding). *Compare Matter of Hearing on Immunity for Ethics Complainants*, 96 *N.J.* 669 (1984) (upholding absolute immunity under Rule 1:20–11(b)), *and Friedland v. Podhoretz*, 174 *N.J. Super.* 73, 89 (Law Div.1980) (complaint filed with attorney ethics committee absolutely privileged in libel case), *and Hill Homeowners Ass'n v. Zoning Bd. of Adj. of Passaic*, 129 *N.J.Super.* 170, 179 (Law Div.1974) (pertinent statements by objector before zoning board absolutely privileged), *aff'd,* 134

*N.J.Super.* 107 (App.Div.1975); *and Fenning v. S.G. Holding Corp.*, 47 *N.J.Super.* 110, 119 (App.Div.1957) (Hughes, J.A.D.) (statements filed with rent control board absolutely privileged), *with Molnar v. The Star-Ledger*, 193 *N.J.Super.* 12, 19–21 (App.Div.1984) (newspaper protected by "fair report" privilege since defamatory statement was made by deputy fire chief acting within the scope of his official duty), *and Devlin v. Greiner*, 147 *N.J.Super.* 446 (Law Div.1977) (private detective's pretrial report not absolutely privileged). We distill from these holdings that immunity varies in proportion to the nature of the official functions and the range of decisions that conceivably might be taken in the exercise of those duties. *See Harlow v. Fitzgerald, supra,* 457 *U.S.* at 810–13, 102 *S.Ct.* at 2734–36, 73 *L.Ed.*2d at 406–07; *Nicoletta, supra,* 77 *N.J.* at 167–68; *J.D. Constr. Corp. v. Isaacs,* 51 *N.J.* 263, 271 (1968).

■ We believe that considering the scope of discretion and responsibilities of the office of municipal parking commissioner and the circumstances as they appeared at the time the action was taken, absolute immunity does not extend to the speech contained in the resolution.

## II.

■ We must define with clarity, however, the standard under which immunity will be lost so that public officers will not fear second-guessing of their decisions. We hold that in defamation actions against non-constitutional public officers arising from the exercise of administrative discretion, immunity will not be lost unless the defamation is made with actual malice in the *New York Times v. Sullivan* sense: "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 *U.S.* at 279–80, 84 *S.Ct.* at 725–26, 11 *L.Ed.*2d at 706. We choose this standard because of the functional equivalence of the actor's conduct in the two contexts. Both the public official and the media serve as instruments to inform the public in a free society. It would be

anomalous if the critic of government enjoyed a greater privilege than the central characters. Equating the concepts "may be viewed in terms of the 'inherent' or 'structural' assumptions of our scheme of government." *Nixon v. Fitzgerald,* 457 *U.S.* at 748 n. 26, 102 *S.Ct.* at 2701 n. 26, 73 *L.Ed.*2d at 362 n. 26.[1]

We choose this single standard as well because of the difficulty of using multiple standards of evaluation. Our common-law standard for loss of a qualified privilege was a showing of "no ill motive or malice in fact." *Rainier's Dairies, supra,* 19 *N.J.* at 558. But these seemingly simple words have been given varied shades of meaning in different contexts. The word "malice" has "plagued the law of defamation from the beginning." *Coleman v. Newark Morning Ledger Co.,* 29 *N.J.* 357, 374 (1959) (quoting W. Prosser, *Handbook of the Law of Torts* 601 (2d ed. 1955)). Justice Heher explored the distinction between malice

> implied by the law from an intentional publication of a defamatory character, even though the defendant harbored no ill will toward the plaintiff, and entertained an honest belief of the truth of what he said [and that malice] meaning "something more than the fictitious 'legal malice' which is 'implied' as a disguise for strict liability in any case of unprivileged defamation"; yet "[meaning] something less than spite, ill will, or a desire to do harm for its own sake," [depending upon whether the publication] "is not made primarily for the purpose of furthering the interest which is entitled to protection." [*Coleman,* 29 *N.J.* at 374–75 (quoting Prosser, *supra,* at 627–28).]

This suggests that superimposing the federal standard on existing state standards would add one more complexity to the "confusion of libel and slander law." Cowan, "Torts," 9 *Rutgers L.Rev.* 157, 172 (1954); *see also* Frakt, "The Evolving Law of Defamation: *New York Times Co. v. Sullivan* to *Gertz v. Robert Welch, Inc.* and Beyond," 6 *Rut.-Cam.L.J.* 471 (1975).

■ We therefore adopt the standard of "actual malice" defined in *New York Times v. Sullivan* as the standard by

---

[1] In *Linn v. United Plant Guard Workers,* 383 *U.S.* 53, 65, 86 *S.Ct.* 657, 664, 15 *L.Ed.*2d 582, 591 (1966), the Court "adopted by analogy" the *New York Times* standard to judge the speech in the context of labor relations "to effectuate the statutory design with respect to preemption."

which to test the loss of the qualified immunity for official speech in these circumstances. In applying the *New York Times* standard, the cases have uniformly emphasized that the jury is not to look for evidence of spite or ill will to judge the actor's speech. *See Garrison v. Louisiana,* 379 *U.S.* 64, 78, 85 *S.Ct.* 209, 217, 13 *L.Ed.*2d 125, 135 (1964) (criminal libel of public figure cannot be based on finding of "ill will or enmity or a wanton desire to injure"). In *Greenbelt Coop. Publishing Ass'n v. Bresler,* 398 *U.S.* 6, 90 *S.Ct.* 1537, 26 *L.Ed.*2d 6 (1970), the Court held that an award of compensatory and punitive damages for a description of the claimant's negotiating position as "blackmail" could not be sustained by allowing the jury to base its verdict on "spite, hostility or deliberate intention to harm":

> This was error of constitutional magnitude, as our decisions have made clear. "This definition of malice is constitutionally insufficient where discussion of public affairs is concerned; '[w]e held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true.'" *Rosenblatt v. Baer,* [383 *U.S.* 75] at 84 [86 *S.Ct.* 669 at 675], 15 L Ed 2d [597] at 604. "[E]ven where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred ...." *Garrison v Louisiana,* 379 US 64, 73, 13 L Ed 2d 125, 132, 85 S Ct 209 [215]. [398 *U.S.* at 10–11, 90 *S.Ct.* at 1539–1540, 26 *L.Ed.*2d at 12–13.]

*See also Marchiano v. Sandman,* 178 *N.J.Super.* 171, 175 (App.Div.1981) (jury should not be free to substitute test of ill will for the constitutional standard of actual knowledge or reckless disregard for the truth).[2]

---

[2]The jury should be instructed to use this standard as well to assess punitive damages. "The universally recognized implication of the Court's curious use of the double negative" in *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 349, 94 *S.Ct.* 2997, 3011, 41 *L.Ed.*2d 789, 810 (1974)—"the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth"—is that "punitive damages are permitted when such 'actual malice' is shown." *Embrey v. Holly,* 293 *Md.* 128, 442 *A.2d* 966, 972 n. 14 (1982); *see also Davis v.*

■ *St. Amant v. Thompson*, 390 *U.S.* 727, 732, 88 *S.Ct.* 1323, 1326, 20 *L.Ed.*2d 262, 267 (1968), explained the relationship of the *New York Times* standard to good faith: "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith." The test is not whether a reasonably prudent person would have made the statement, but whether there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731, 88 *S.Ct.* at 1325, 20 *L.Ed.*2d at 267.

Of course, we are not speaking here of statements made by public officials outside the scope of their duties. *See Kilgore v. Younger*, 30 *Cal.*3d 770, 640 *P.*2d 793, 180 *Cal.Rptr.* 657 (1982) (California statute gives attorney general absolute privilege for statement made in "proper discharge of an official duty"); *Hancock v. Burns*, 158 *Cal.App.*2d 785, 323 *P.*2d 456 (1958) (discussing scope of legislative immunity). Our Tort Claims Act, *N.J.S.A.* 59:3-14(a), does not extend immunity for "conduct * * * outside the scope of * * * employment or constitut[ing] a crime, actual fraud, actual malice or willful misconduct." The cases concur that immunity does not reach activities beyond "the limitations which the controlling law has placed on [the public official's] powers." *Butz v. Economou*, 438 *U.S.* 478, 489, 98 *S.Ct.* 2894, 2902, 57 *L.Ed.*2d 895, 905 (1978). As long as the statement is made within the exercise of the public officer's powers, it is privileged unless made with knowledge of or serious doubts about the falsity of the statement.

---

*Schuchat,* 510 *F.*2d 731, 737 (D.C.Cir.1975) (*"[G]ertz* appears to have linked the propriety of punitive damages to the rigors of the *New York Times* definition of actual malice.").

### III.

Applying this standard to this case leads us to reverse. The trial court was troubled by the problem of reconciling the two concepts of malice. It viewed the plaintiff as a public official and felt bound to charge the *New York Times* standard of malice as well as the state standard of malice as expressed in *Coleman, supra,* 29 *N.J.* at 374–75, that is, acting "not primarily for the purposes of furthering the interests" of the Authority but "chiefly for a wrongful motive, a malicious reason or ill will towards Mr. Burke * * *." The court's verdict sheet, however, required the plaintiff to overcome both hurdles. Thus, the plaintiff argues that defendants have had more than full advantage of the standard we now adopt and cannot complain of the additional focus on the aspects of ill will or personal enmity.

We disagree that the use of both meanings of "malice" did not prejudice the defendants. Permitting the jury to consider any secret motives of the commissioners unfairly distracted its focus from the central question of constitutional dimension: whether in exercising their duties as officials in a self-governing democracy they stated facts that they knew to be false or about which they entertained serious doubt. The jury was allowed to consider the decor in plaintiff's office when he was restored to duty as bearing on the ill will that defendants bore against him. He complained that his restored office had "an old wooden desk and broken chairs" and was "extremely dirty." Defendant Deiner, it was suggested, harbored ill will toward Burke because Burke took over his job as Executive Director in 1971. Deiner's reliance on the unsightly conditions of the Authority property as a reason to fire Burke was contrasted with his own inaction as a member of the Authority's "Street Sweeper Committee." There was extensive examination as to the Mayor's manipulation of the commissioners (the defendants were described as "paying the Mayor the price for their appointments"); the fact that the resolution had been prepared by the city's attorney, not the Authority's; and the fact that the

members had not even seen the resolution until the night of the meeting and some had not read Burke's contract.

Each of the defendants was cross-examined extensively, not about whether he had reason to disbelieve the contents of the resolution, but whether he had met with the Mayor; why the resolution referred to Burke's daughter; why the resolution referred to Burke's refusal to accede to the Mayor's request to resign; why they got the resolution at the last minute; and why they didn't confer with Burke before firing him. This penetrating cross-examination may demonstrate all the wrong reasons for firing Burke, but it also shows how far we must go when we weigh ulterior motives. The last thing we want to do with debate on public affairs is transfer it from the courthouse square to the courtroom.

The points made prove little with respect to whether the defendants entertained serious doubts about the substance of the Rosenthal & Attinger report. Even at trial one defendant insisted "the resolution *in toto* was true." Another explained that "public funds should not be counted on the kitchen table." In fact, plaintiff's own expert witness admitted that his records showed that two of the more serious deficiencies noted—the cashing of checks by employees and the fact that employees had taken money home at night—were correct. He disputed the charge that receipts were not deposited daily, attributing this to the bank practice of entering deposits made after regular banking hours on the next calendar date. We do not believe the jury could have sorted out these extraneous concepts in forming its judgment.

We therefore must decide whether the matter should be resubmitted to the jury under the *New York Times* standard. In *Harlow v. Fitzgerald, supra,* the Supreme Court emphasized that courts must carefully weigh allegations in light of established law so that public officials can discharge their duties without excessive judicial supervision. 457 *U.S.* at 818–19, 102 *S.Ct.* at 2738–39, 73 *L.Ed.*2d at 410–11. The Court recently

restated that central role in an analogous context: "Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose Corp. v. Consumers Union of U.S., Inc.,* —— *U.S.* ——, ——, 104 *S.Ct.* 1949, 1965, 80 *L.Ed.*2d 502, 523 (1984).

First, we must note how close the language of the resolution was to opinion since it incorporated by reference the auditors' findings and would permit the listener to evaluate the idea in the context of the disclosed facts. *See Greenbelt Coop. Publishing Ass'n v. Bresler, supra,* 398 *U.S.* at 13–14, 90 *S.Ct.* at 1541–1542, 26 *L.Ed.*2d at 14–15 (charge of "blackmail" negotiating position in context of heated debate and full report of proceedings not actionable); *Kotlikoff v. The Community News,* 89 *N.J.* 62, 71–72 (1982) (allegation of "cover up" by mayor and tax collector in letter to the editor that fully outlined facts not libel; only "[l]anguage that could reasonably be understood as implying specific criminal acts on the basis of undisclosed factual allegations" is actionable). But we also recognize that an unsupported implication may be more harmful than anything, *Coleman v. Newark Morning Ledger,* 29 *N.J.* at 389–90 (Weintraub, C.J., dissenting in part), and do not bottom our decision on that.

Passing that, we do not find clear and convincing proof of *New York Times* malice:

> The burden of proving "actual malice" requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement. See, *e.g., New York Times v. Sullivan, supra,* 376 U.S., at 280 [84 *S.Ct.,* at 726]; see also *Gertz v. Robert Welch, supra,* 418 U.S., at 342 [94 *S.Ct.,* at 3008]; *St. Amant v. Thompson,* 390 U.S. 727, 731 [88 *S.Ct.* 1323, 1325, 20 *L.Ed.*2d 262] (1968) * * *. [*Bose Corp., supra,* —— *U.S.* at —— n. 30, 104 *S.Ct.* at 1965 n. 30, 80 *L.Ed.*2d at 524 n. 30.]

*See also Dairy Stores, Inc. v. Sentinel Publishing Co., Inc.,* 191 *N.J.Super.* 202, 221–22 (Law Div.1983).

We find there was insufficient, if any, evidence that the defendants ever entertained serious doubts about the truth of the matters contained in the resolution. Each continued to believe that the auditors' report adequately documented the truth of the fact that the Authority's affairs were handled negligently. Even the jury was confused about the reference to negligent operations "bordering on misappropriation or misuse" and requested the court to define the latter phrase, which the court declined to do. Students of public administration may find the conduct of these commissioners lacking in that degree of care that might be expected. But the law cannot punish one who speaks on public affairs for lack of care.

■ We are satisfied that the result is fair. The interest in punishing speech by a public officer declines in relationship to the adequacy of the procedures available to remedy the wrong. See Handler & Klein, "The Defense of Privilege in Defamation Suits Against Government Executive Officials," 74 Harv.L.Rev. 44 (1960). It is one thing to be the victim of a news release without recourse except in a libel proceeding; it is another to have an available civil remedy for reinstatement and back pay as did the claimant here. Indeed, it could well be argued that the principles of the entire controversy doctrine would preclude the serial prosecution of these claims, first against the Authority, then against its officers. Cf. Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 347 (1984) (Handler J., concurring) (entire controversy doctrine should apply to parties as well as claims).

■ We hold that (1) such public officers enjoy a qualified immunity from action for defamation; (2) the standard by which to judge their speech is that of New York Times v. Sullivan—a realization of falsity or serious doubt about the truth of the statement; (3) courts should carefully screen proceedings to test whether this standard is met; and (4) the record in this case will not sustain such a finding.

The judgment below is reversed.

*For reversal*—Justices CLIFFORD, SCHRIEBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For affirmance*—None.