232 N.J. Super. 99 (1989)
556 A.2d 788
DAVID D. BRAYSHAW, PLAINTIFF-RESPONDENT,
v.
JOAN D. GELBER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted December 6, 1988.
Decided April 6, 1989.
*101 Before Judges MICHELS, MUIR, Jr., and KEEFE.
Cary Edwards, Attorney General of New Jersey, attorney for appellant (James J. Ciancia, Assistant Attorney General and Emerald L. Erickson, Deputy Attorney General, of counsel and Emerald L. Erickson, on the brief).
David D. Brayshaw, respondent, pro se.
The opinion of the court was delivered by MICHELS, P.J.A.D.
We granted leave to defendant Joan D. Gelber, a Deputy Attorney General of the State of New Jersey, to appeal from an order of the Law Division that denied her motion for summary judgment in this defamation action instituted by plaintiff David D. Brayshaw.
A brief review of the background and chronology of events giving rise to this appeal is helpful to an understanding of its resolution. This action arises out of an administrative proceeding to revoke the medical license of plaintiff's wife, Dr. Nora Brayshaw. Defendant is the Deputy Attorney General assigned to prosecute the case against Dr. Brayshaw for the New Jersey Board of Medical Examiners (Board). Dr. Brayshaw is a psychiatrist licensed by the Board and her practice is based at The Biopsychiatry Center in Watchung, New Jersey. A significant portion of her practice involves the treatment of psychiatric disorders, such as panic, depression and Premenstrual Syndrome (PMS), with thyroid replacement therapy. Under this therapy, Dr. Brayshaw prescribes a thyroid supplement such as Synthroid, a synthetic thyroid hormone. Dr. Brayshaw's decision to treat patients with a thyroid hormone is founded upon her belief that the patient's psychiatric problems are medical or biological in origin. Specifically, Dr. Brayshaw believes that *102 many of her patients suffer from various thyroid disorders such as hypothyroidism, a diminished production of thyroid hormone leading to thyroid deficiency.
Plaintiff, an attorney admitted to practice in New York and California, participated in the analysis and observation of Dr. Brayshaw's patients and coauthored several medical articles relating to the thyroid replacement therapy. Plaintiff is also the president of DNB Laboratories, Inc. (DNB), a New Jersey corporation that is wholly owned by the Brayshaws.
As of February 1987, the Board had received complaints about Dr. Brayshaw from a former patient and also from several physicians who had treated individuals previously under the care of Dr. Brayshaw. These complaints were referred to the Enforcement Bureau of the Division of Consumer Affairs which began an investigation into whether Dr. Brayshaw had "prescribed thyroid hormone without medical justification and/or in inordinate amounts and/or without proper follow-up" care. The investigation, under defendant's supervision, revealed that Dr. Brayshaw had maintained certain patients on the thyroid hormone in spite of indications of thyroid toxicity.
In early May 1987, Dr. Brayshaw substantially complied with a subpoena ordering her to produce records for 25 patients who the investigation indicated may have received improper treatment. A second subpoena was served on Dr. Brayshaw on May 4, 1987. This subpoena ordered production of the medical records of 34 PMS patients referred to in a letter in the May 1987, issue of Women's Sports and Fitness. The magazine article, in pertinent part, read as follows:
[D]octors Nora and David Brayshaw of the Biopsychiatry Center in Watchung, New Jersey, reported that thyroid supplements had cured an entire group of 34 PMS patients. The treatment program arose out of earlier research in which the Brayshaws studied the thyroid functions of 66 women. Fifty-one of the 54 women who had reported premenstrual problems were found to have some sort of thyroid dysfunction, while the 12 women who were symptom-free had no thyroid abnormalities.
In response to the second subpoena Dr. Brayshaw indicated that the 34 patients were selected anonymously from a group of *103 100 patients listed on a computer disc that subsequently had been "overwritten with new patient information." Dr. Brayshaw stated that she maintained medical records on all of her patients, but was "not able to ascertain which patient records [were] required by the subpoena" due to the nature of the patient selection method used for the study. Consequently, Dr. Brayshaw was unable to comply with the subpoena.
On August 11, 1987, Dr. Brayshaw voluntarily appeared with counsel and plaintiff for a sworn statement regarding the matters under investigation by the Board. During the course of this meeting Dr. Brayshaw testified that after she determines that a patient requires thyroid function testing, she informs the patient that there are "only a few [laboratories] that can do some of the testing," and she recommends that the patient have the testing done at DNB.
Following Dr. Brayshaw's testimony, plaintiff testified as to the workings of DNB. According to plaintiff, DNB is a corporation set up solely to do testing for Dr. Brayshaw's patients. DNB, however, has no laboratory facilities and does no laboratory testing of its own. Instead, DNB employs nurses to draw the blood samples at Medi-Center facilities in Wayne. Thereafter, the samples are sent to various independent laboratories where the actual testing is done and the results are sent to DNB and "re-typed" on a DNB lab report form.
According to Dr. Brayshaw, the test results are transferred from the independent laboratory report form to the DNB form because the DNB form is easier to understand and allows for the inclusion of different or additional information such as a different test result normal range than the one provided by the independent laboratory. Presumably, the test result normal range is included on the lab form so the patient may see whether their test result falls within the "normal range" of results.
The patients pay one fee to DNB at the time the blood samples are taken. This fee is higher than the fee charged to *104 DNB by the independent laboratories. According to plaintiff, this increased fee is necessary because DNB must pay for the nurses and the Medi-Center facilities as well as the actual blood testing done by the independent laboratories.
On or about September 2, 1987, the Board served Dr. Brayshaw with a verified complaint seeking the temporary suspension of her medical license. The complaint charged generally that: (1) Dr. Brayshaw fails to maintain records of fees charged to patients; (2) Dr. Brayshaw fails to disclose her ownership interest in DNB to her patients; (3) DNB is an unlicensed laboratory and a "sham entity" that bills patients for services rendered by independent laboratories; (4) Dr. Brayshaw merely recopies test results from the independent laboratories onto DNB stationery and changes the normal reference ranges and explanatory material provided by the independent laboratories; (5) DNB charges test fees that are "in excess of the fees actually charged" by the independent laboratories; (6) Dr. Brayshaw "has no data in a form recognized as consistent with accepted standards of scientific research" to substantiate claims that she has performed research correlating PMS and depression to hypothyroidism and that these conditions can be treated with a thyroid supplement; (7) Dr. Brayshaw fails to maintain proper patient records; (8) Dr. Brayshaw does not perform physical examinations or clinical evaluations of patients before ordering laboratory tests and prescribing medication; (9) Dr. Brayshaw prescribes excessive dosages of thyroid supplement and fails to adequately respond to patients complaining of symptoms of thyroid toxicity in spite of "an admonishment issued on or about July 10, 1985, by the State Board of Medical Examiners for failure to be available to patients attempting to reach her," and (10) Dr. Brayshaw was negligent or incompetent in her treatment of 26 patients. The complaint included supporting affidavits from 12 physicians regarding 22 of the 26 patients described in the complaint. A supplemental complaint setting forth similar charges with respect *105 to an additional 15 patients was filed on November 25, 1987.
On September 9, 1987, a hearing was held before the Board to determine whether Dr. Brayshaw should be "temporarily suspended because of alleged gross malpractice and fraud with regard to her prescribing dangerous dosages of thyroid hormone to 26 patients." Dr. Brayshaw and plaintiff were present at the hearing. Dr. Brayshaw was not represented by an attorney at the hearing, but she was informed that she had the right to legal representation. She indicated that she was on her own and was "satisfied" to proceed without representation by an attorney.
At the conclusion of the hearing, the Board made a preliminary finding that Dr. Brayshaw's license should be temporarily suspended because her continued practice presented "a clear and imminent danger" to the public health. Thereafter, the Board issued an order temporarily suspending Dr. Brayshaw's license to practice medicine. In this order, the Board reiterated its finding that Dr. Brayshaw's practice presented a "clear and imminent danger to the public health." Specifically, the Board noted its concern that Dr. Brayshaw was "initiating patients on potent endocrine therapies without adequate physical exam, without appropriate monitoring and without personally responding to patients who evidence symptoms of thyrotoxic states."
The order provided, however, that Dr. Brayshaw would be permitted to resume her practice if she presented a plan wherein she agreed: (1) to refrain from prescribing any thyroid medication; (2) to perform adequate physical examinations, with proper documentation, before recommending endocrine treatment; (3) to refrain from altering a therapeutic plan initiated by another physician without first consulting with that physician; (4) to make herself personally available to respond to patient complaints in a timely manner or provide "appropriate coverage," and (5) to "cease and desist in operating DNB *106 Laboratories and any other successor laboratory." Dr. Brayshaw did not institute this recommended plan.
On October 21, 1987, after a special hearing, the Board denied Dr. Brayshaw's motion for reinstatement of her license.[1] On November 18, 1987, at its regular meeting, the Board determined that Dr. Brayshaw's "continued unreformed practice" constituted a clear and imminent danger. Therefore, the Board decided that the temporary suspension would continue in effect pending a plenary hearing on the complaint filed by the Attorney General of New Jersey. To date, several hearings have been held but the Board has not made a final determination on Dr. Brayshaw's fitness to practice medicine.
Plaintiff instituted this action against defendant alleging that defendant defamed him in the complaint issued regarding his wife and that defendant caused four libelous newspaper articles to be published. Specifically, plaintiff charged that defendant defamed him by stating that DNB, of which he is president, is a "sham" laboratory which falsifies laboratory reports and that the research, of which he is coauthor, was fraudulent and not conducted according to accepted scientific standards. With respect to the newspaper articles, plaintiff alleged that defendant spoke to reporters and caused the following libelous articles to be published:
1. On September 27, 1987, the Sunday Star-Ledger published an article that, in pertinent part, read as follows:
A Watchung physician, who claimed she was doing thyroid hormone research, has been suspended from medical practice on charges that she failed to provide adequate examinations and monitoring and sometimes falsified lab reports on patients who were often getting twice the usual dose of a replacement hormone.
According to the state Attorney General's Office, the charges which led to the license suspension of Dr. Nora Brayshaw involved more than 20 patients.

*107 The office has learned of others and expects to expand the case, authorities said.
Based on the complaint and following an emergency hearing at which Brayshaw appeared, the state Board of Medical Examiners voted Sept. 9 to suspend Brayshaw's medical license pending a full hearing before the Office of Administrative Law.
The complaint charges Brayshaw prescribed thyroid hormone in high doses without doing any physical examinations to pinpoint the need for the therapy. Hearing irregularities, calcium loss from the bones and creation of a thyroid problem where none existed are among the potential problems of overmedication, the complaint noted.
The state also charged that Brayshaw and her husband David created a "sham" corporation, DNB Laboratories Inc.
Brayshaw, the state charged, would send patients to licensed laboratories for testing, transfer the results to the DNB letterhead and sometimes change normal results to reflect abnormal values that justified the hormone therapy.
The complaint said she would use the DNB letterhead to charge patients lab fees that were higher than the testing lab billed and would not disclose the add-on, which is in violation of state regulations.
2. On October 1, 1987, the Courier News published an article that, in pertinent part, read as follows:
The board also charged that Brayshaw, a 43-year-old graduate of Stanford University's School of Medicine fabricated her research findings and joined her husband, David, in a [sic] setting up a fraudulent lab operation that billed excessive fees from patients.
3. On October 8, 1987, the Courier News published an article that, in pertinent part, read as follows:
State medical authorities plan to file an expanded disciplinary complaint against a prominent Watchung psychiatrist accused of mistreating patients with a controversial hormone therapy.
* * * * * * * *
The medical board also charged Brayshaw with fabricating research data, altering laboratory reports and setting up a bogus lab that charged exorbitant fees.
4. Finally, on October 22, 1987, the Courier News published an article that, in pertinent part, read as follows:
A three-member panel of the state Board of Medical Examiners has upheld the license suspension of a prominent Watchung psychiatrist on charges she mistreated more than two dozen patients with a synthetic thyroid hormone.
* * * * * * * *
The 43-year-old Brayshaw, who owns The Biopsychiatry Center in Watchung, is also accused of altering laboratory reports and, with her husband, *108 David, establishing a fraudulent lab operation that charged excessive fees to patients.
Defendant contended, however, that she did not initiate contact with the above mentioned newspapers and that she had no recollection of her conversations with the reporters. She stated that her communications with the press were limited "to the public record ... includ[ing] the allegations contained in the Verified Complaint filed against Dr. Brayshaw." She further stated that her communications with the press were in line with the Attorney General's press policy that called for the Deputies in the Division of Law to "deal with the press and to do so in a courteous, responsive and  above all  truthful manner."
Defendant moved for summary judgment on the ground that under case law and the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq., (Tort Claims Act), she had an absolute privilege and was not liable for defamatory statements. Initially, the trial court held that the statements "defendant made about the plaintiff in the complaint [were] absolutely privileged." The trial court held, however, that the statements made to the press were not "judicial or quasi-judicial" in nature and, therefore, were not protected by the absolute immunity. Thereafter, the trial court denied defendant's motion for summary judgment, reasoning essentially that there was a factual issue regarding whether defendant had acted with malice so as to negate the qualified immunity granted under N.J.S.A. 59:3-3. This appeal followed.
On appeal, defendant contends that the trial court erred in denying her motion for summary judgment because she was immune from suit with respect to her communications with the press. Specifically, defendant claims that she is protected from liability by the qualified immunity granted to public employees under the Tort Claims Act. We agree and reverse.
Tort claims against public employees such as defendant are governed by the provisions of the Tort Claims Act. N.J.S.A. 59:3-1 provides:

*109 a. Except as otherwise provided by this act, a public employee is liable for injury caused by his act or omission to the same extent as a private person.
b. The liability of a public employee established by this act is subject to any immunity of a public employee provided by law and is subject to any defenses that would be available to the public employee if he were a private person.
Thus, under the Tort Claims Act, a public employee is liable for the injuries caused by his acts or omissions to the same extent as a private person unless he is granted immunity. Among the specific immunities granted to public employees by the Tort Claims Act is an immunity from liability for injuries and damages if the public employee acts in good faith in the execution or enforcement of any law. N.J.S.A. 59:3-3 reads:
A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.
In Hayes v. Mercer County, 217 N.J. Super. 614, 622 (App. Div. 1987), certif. den. 108 N.J. 643 (1987), we adopted an objective good faith standard, derived from the United States Supreme Court's opinion in Harlow v. Fitzgerald, 457 U.S. 800, 807, 102 S.Ct. 2727, 2733, 73 L.Ed.2d 396, 403-404 (1982), in determining the applicability of the qualified immunity granted by N.J.S.A. 59:3-3. In Hayes, the plaintiff was the subject of extradition proceedings initiated by, among others, the Mercer County Assistant Prosecutor and an investigator in the prosecutor's office. The plaintiff brought an action for false arrest and related torts under 42 U.S.C.A. § 1983 and the New Jersey Tort Claims Act. The trial court granted summary judgment on the ground that all defendants were absolutely immune under Federal and New Jersey law. On appeal, we held that the Mercer County Prosecutor was entitled to an absolute immunity from suit, but the investigator was only "`entitled to a qualified immunity for official actions taken in good faith.'" Hayes, supra, 217 N.J. Super. at 621 (citing Ross v. Meagan, 638 F.2d 646, 649 (3rd. Cir.1981) and Cleary v. Andersen, 423 F. Supp. 745, 749-750 (D.C.Neb. 1976)). We then discussed the good faith component of the qualified immunity under N.J.S.A. 59:3-3:

*110 In considering the scope of a public employee's immunity in the context of an action against the employee for defamation, our Supreme Court quoted liberally from Harlow v. Fitzgerald, supra, and adopted that Court's general view that public employees should be able to "discharge their duties without excessive judicial supervision." Burke v. Deiner, 97 N.J. 465, 480 (1984). For the same reason we adopt the objective good-faith standard announced in Harlow as the standard to be applied in defining the good-faith component of qualified immunity under the Tort Claims Act. In our discussion of the federal qualified immunity, we stated why the investigator acted in good faith here.

To prevail on a motion for summary judgment, a public employee need not establish his subjective, i.e., actual, good faith if his conduct was objectively reasonable. Subjective good faith nevertheless remains available to a public employee as a second line of defense, which he may raise at trial even if he was not acting reasonably. [Hayes, supra, 217 N.J. Super. at 622. (Emphasis added)].
We acknowledged that this qualified immunity was subject to N.J.S.A. 59:3-14a as are all Tort Claims Act immunities. N.J.S.A. 59:3-14a provides:
Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.
We concluded that the investigator was entitled to the protection of the qualified immunity and affirmed the summary judgment because "[t]here was no evidence that the investigator's conduct constituted a crime, actual fraud, actual malice or willful misconduct that would cause the investigator to lose his qualified immunity." Hayes, supra, 217 N.J. Super. at 623.
Applying the objective good-faith standard of Hayes to the facts before us, we are satisfied that defendant adequately established that she acted in an "objectively reasonable" manner in the performance of her duties and, therefore, she was entitled to a qualified immunity under N.J.S.A. 59:3-3.
Regulatory agencies such as the Board are assigned the task of protecting the health and welfare of the members of the public by insuring that all licensed practitioners are qualified, competent and honest. See In re Polk License Revocation, 90 N.J. 550, 574 (1982); In re Suspension of Heller, 73 N.J. 292, 303-304 (1977). Pursuant to N.J.S.A. 45:1-18, the Board is empowered, either on its own or through the Attorney General, *111 to initiate investigations of medical doctors. See Beck v. Bluestein, 194 N.J. Super. 247, 258 (App.Div. 1984); Sinderbrand v. Schuster, 170 N.J. Super. 506, 509 (Law Div. 1979). Moreover, the Board is granted the power to suspend and/or terminate the license of a physician whose practice is found to endanger the health or life of any person. N.J.S.A. 45:9-16.
Defendant was assigned to render legal services to the Board and in that capacity she was responsible for the overall supervision of investigations into the practices of physicians about whom complaints had been received. She was also responsible for prosecuting those physicians whose actions appeared to pose a threat to the public. As the Deputy Attorney General assigned to handle Dr. Brayshaw's case, defendant was within the scope of her employment in supervising the investigation, drawing up the complaint, and representing the Board at all hearings.
Defendant was also within the scope of her duties in communicating with the press concerning the allegations and charges contained in the verified complaint filed against Dr. Brayshaw. She was charged with upholding the policies of the Attorney General and this responsibility included compliance with the policy that mandated openness with the press concerning factual matters. The suspension of Dr. Brayshaw's medical license was a newsworthy matter of significant public interest. In responding to press inquiries on this matter, defendant properly explained the nature and meaning of the charges contained in the complaint and there is nothing in the record to suggest that defendant exceeded the bounds of her duty and responsibility in this regard.
The propriety of defendant's communication with the press in relation to the administrative action against Dr. Brayshaw is well recognized in this State. In Molnar v. Star-Ledger, 193 N.J. Super. 12, 20 (App.Div. 1984), certif. den. 99 N.J. 162 (1984), we held:

*112 Although the communication of information to the news media may not be "specifically [d]esignated" as a duty of public officials, "it is increasingly recognized that if this communication pertains to matters which are within the scope of an official's responsibilities, such statements should be regarded as being within the `outer perimeter' of the officials' `line of duty'". Sinderbrand v. Schuster, 170 N.J. Super. 506, 509-510 (Law Div. 1979), quoting Barr v. Matteo, 360 U.S. 564, 574-575, 79 S.Ct. 1335, 1338, 1341, 3 L.Ed.2d 1434 (1959).
It is equally well established that defendant is afforded a qualified privilege for any defamation uttered in the process of communicating with the press in relation to the administrative action against plaintiff's wife. Again, in Molnar, we noted:
We have long recognized the existence of a qualified privilege that confers immunity upon a public official for defamation uttered in relation to matters committed by law to his control or supervision. [Molnar, supra, 193 N.J. Super. at 19 (quoting Barbetta Agency, Inc. v. Evening News Pub. Co., 135 N.J. Super. 214, 220 (App.Div. 1975)].
See Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 380 (1959). See generally Annotation, "Defamation: Privilege Attaching To News Report of Criminal Activities Based on Information Supplied By Public Safety Officers  Modern Status," 47 A.L.R. 4th 718 (1986).
The record shows that defendant acted with the requisite "objective good-faith" in representing the Board and in following the press policy promulgated by the Attorney General. The allegedly libelous articles merely set forth, in plain and understandable language, the allegations of the verified complaint concerning Dr. Brayshaw's methods of practice and her business dealings with plaintiff in the operation of DNB.
Finally, plaintiff could not overcome defendant's qualified privilege simply by alleging that defendant's communications with the press were motivated by subjective "bad faith" or "malice" or by asserting that the offending articles had no basis in fact. In determining whether the qualified privilege was lost, the standard by which defendant's conduct should have been tested was established by the New Jersey Supreme Court in Burke v. Deiner, 97 N.J. 465 (1984). In Burke, plaintiff brought a defamation action against those members of *113 the New Brunswick Parking Authority who participated in adopting a resolution discharging him as the Executive Director of the authority. The central issue before the Burke Court was "whether [the] municipal authority members [had] a qualified or an absolute privilege with respect to [the] allegedly defamatory resolution...." Burke, supra, 97 N.J. at 468.
The Burke Court held that the municipal authority members were protected by a qualified immunity rather than an absolute immunity. In so holding, the Court "adopt[ed] the standard of `actual malice' defined in New York Times v. Sullivan as the standard by which to test the loss of the qualified immunity for official speech in these circumstances." Id. 476-477. This standard provides that the "immunity will not be lost unless the defamation is made with actual malice in the New York Times v. Sullivan sense: `with knowledge that it was false or with reckless disregard of whether it was false or not.'" Id. at 475 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279-280, 84 S.Ct. 710, 725-726, 11 L.Ed.2d 686, 706 (1964)).
The Burke Court acknowledged that the actual malice standard did not apply to statements made by public officials outside of the scope of their duties. Burke, supra, 97 N.J. at 478 (citing Kilgore v. Younger, 30 Cal.3d 770, 640 P.2d 793, 180 Cal. Rptr. 657 (Sup.Ct. 1982)). In this regard, the Court stated that N.J.S.A. 59:3-14a mandated a loss of immunity if the conduct "was outside the scope of the employment or constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3-14a. The Burke Court reconciled the New York Times Co. v. Sullivan "actual malice" standard with the standard set out in N.J.S.A. 59:3-14a by noting:
As long as the statement is made within the exercise of the public officer's powers, it is privileged unless made with knowledge of or serious doubts about the falsity of the statement. [Burke, supra, 97 N.J. at 478].
*114 In the present case, the trial court concluded that there was a factual issue "as to whether [defendant] had malice when she made the statements to the press." Under the Burke standard, however, it is clear that plaintiff could overcome defendant's qualified privilege only by showing, through clear and convincing proof, that defendant communicated the information with "actual malice", i.e., with knowledge that the information was false or with reckless disregard of whether it was false or not. The inquiry should not have focused on malice in the sense of "ill will or personal enmity." Burke, supra, 97 N.J. at 479. As the Burke Court stated:
Permitting the jury to consider any secret motives of the commissioners unfairly distracted its focus from the central question of constitutional dimension: whether in exercising their duties as officials in a self-governing democracy they stated facts that they knew to be false or about which they entertained serious doubt. [Id.].
Thus, the trial court erred by considering "ill will" malice rather than "actual malice" as the basis for denying defendant's motion for summary judgment. Application of the proper definition of malice, namely, actual malice in the New York Times Co. v. Sullivan sense, would have required the trial court to determine whether there was a genuine issue of material fact so as to permit the conclusion that the defendant "`entertained serious doubts as to the truth of [the] publication.'" Burke, supra, 97 N.J. at 478 (quoting St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968)). See Gomez v. Murdoch, 193 N.J. Super. 595, 602 (App.Div. 1984); Marchiano v. Sandman, 178 N.J. Super. 171, 176 (App.Div. 1981), certif. den. 87 N.J. 392 (1981).
We are thoroughly convinced that plaintiff failed to meet his burden of proving that there was a genuine issue as to whether defendant knew or even "entertained serious doubts as to the truth" of the statements contained in the press articles. The record is devoid of any evidence to support a finding that the release of the information to the press was made with actual malice. Defendant's comments to the press were limited *115 to the public record before the Office of Administrative Law and the Board as well as the allegations in the verified complaint. By allowing plaintiff's action to survive defendant's motion for summary judgment without plaintiff having presented clear and convincing proof of defendant's actual malice, the trial court, in effect, improperly placed upon defendant the burden of disproving actual malice. Consequently, we hold that defendant was entitled to the qualified immunity granted by N.J.S.A. 59:3-3 and, therefore, was immune from any liability to plaintiff as a matter of law. We must not lose sight of the fact that our Supreme Court has encouraged the utilization of the summary judgment proceeding in cases of this kind. See Maressa v. New Jersey Monthly, 89 N.J. 176, 196-197 (1982), cert. den. 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982); Kotlikoff v. The Community News, 89 N.J. 62, 67-68 (1982); Molnar, supra, 193 N.J. Super. at 22.
Accordingly, the order of the Law Division denying defendant's motion for summary judgment is reversed and summary judgment is entered in favor of defendant.
NOTES
[1] On November 2, 1987, we denied Dr. Brayshaw's emergent application for a stay of the Board's order of temporary suspension. Thereafter, on December 9, 1987, we granted the Board's motion to dismiss Dr. Brayshaw's appeal as interlocutory.